HOWARD K. STOKES

*v.*

NEWARK MEADOWS IMPROVEMENT COMPANY et al.

[Decided February 7th, 1919.]

1. In a case in which a corporation was organized for the purpose of reorganizing two preceding corporations, and its securities, first and second mortgage bonds, and stock were issued to security holders of the preceding corporations, and its board of directors from the outset was, in reality, representative of its first mortgage bondholders, and not in any true sense representative of its creditors and stockholders, and where, after a plan of reorganization had been formulated, under the provisions of which the first mortgage was to be foreclosed, and all of its property bought in by a representative of the first mortgage bondholders, and then transferred to a corporation to be organized, the securities of such new corporation to be issued to the security holders of the old corporation, and proceedings were instituted to foreclose the first mortgage in pursuance of such plan, consented to by the board of directors, upon which there are a majority of the committee of first mortgage bondholders having power to bind the first mortgage bondholders to any act which might be considered necessary to secure the success of the plan, and with the consent of the board of directors a receiver was appointed, *held* that the first mortgage bondholders will be considered as mortgagees in possession and the new corporation to whom the assets have been transferred in pursuance of the plan, and whose securities have been issued in pursuance thereof, will be held liable upon a contract entered into by the old corporation, and a contractor, at a time after the plan had been formulated and agreed to and a short time prior to the filing of the bill to foreclose the first mortgage in pursuance of the plan of reorganization, providing for the filling in and enhancing the value of the lands of the corporation, the work proceeding during the time of the receivership and under the direction of the receiver, the contract having been entered into with the knowledge of the committee of bondholders.

2. Bondholders are estopped from denying responsibility on a contract, the result of the performance of which, during a time when their representatives knew that proceedings in their behalf were being taken to foreclose the interest of the mortgagor and to effect a vesting of title in their creature, has been to enhance the value of their property, the contractor being without notice of any such proceedings.

3. The second mortgage bondholders of the old concern who have been let in gratuitously to participate in the securities of the new concern,

after a foreclosure of their rights in the old concern, cannot complain if the claim of a contractor, for work performed, which has enhanced the value of the property during foreclosure proceedings, is preferred to any interest that they may have.

4. In a situation where a corporation was in control of a board of directors in reality representing first mortgage bondholders, and there was a committee of first mortgage bondholders, the majority of whom were members of the board of directors of the corporation, which committee had power from the bondholders to perform all acts which might be necessary in their judgment to effect a plan of reorganization, and a plan had been formulated, which provided for the foreclosure of the first mortgage, the purchase of the property by the representative of the first mortgage bondholders, the transfer to a corporation to be incorporated, and the issuance of securities by the new corporation to holders of securities in the old corporation, and on the eve of proceedings to foreclose being instituted and the plan carried out, a contract was made, to the knowledge of the representatives of the first mortgage bondholders, providing for work on the land which enhances its value, and the work proceeded without notice to the contractor of the plan, or of the proceedings thereunder, during most of which time the property was under the control of a receiver appointed at the instance of the first mortgage bondholders, with the acquiescence of the corporation, and the receiver supervised such work and actually participated therein, and the property was subsequently bought in by the nominee of the bondholders, and by him transferred to a corporation, incorporated by the bondholders, and the securities of that corporation issued to security holders of the old concern, in accordance with the plan, held that the land in the hands of the new corporation is charged with the lien for the amount that it has been enhanced by the work of the contractor, and that second mortgage bondholders who have been gratuitously let in after the foreclosure by the first mortgage bondholders are not entitled to any rights as against the contractor.

5. In such a case the land upon which the improvement had been made having been sold to a *bona fide* purchaser for value, without notice, a money decree may go against the new corporation, or such other decree as will have the effect of preferring the contractor to the interests of the first and second mortgage bondholders of the old concern.

On bill, &c.

Messrs. *McDermott & Enright* (Mr. *Enright*), for the complainant.

Mr. *Kenneth D. Cranstoun* and Mr. *Gilbert Collins,* for the defendants.

LANE, V. C.

Complainant has a judgment obtained in the supreme court on December 13th, 1917, for $14,297.83 against Newark Meadows Improvement Company. The judgment was for the amount due complainant for work performed under a contract between complainant and Newark Meadows Improvement Company made April 16th, 1913, for the improvement of a portion of the lands of said company. The object of the present bill is to impress the judgment as a lien upon the lands of Newark Factory Sites, Inc., which became possessed of all of the property of Newark Meadows Improvement Company under the circumstances hereinafter related (that portion of the lands upon which the improvements were made have been sold by Newark Factory Sites, Inc., to a *bona fide* purchaser for value without notice) ; or to have a money decree against Newark Factory Sites Company, or for relief against the holders of certain securities of that company. Newark Meadows Improvement Company was incorporated in 1908, and was in fact a reorganization of two corporations then existing—the Hackensack Meadows Company and New Jersey Terminal Dock and Improvement Company. Its securities were distributed to the holders of securities of the last-named corporations. There were issued, approximately, $1,800,-000 of first mortgage bonds and $2,000,000 of second mortgage bonds. The trustee of the first mortgage was the Standard Trust Company, now merged in the Guaranty Trust Company; the trustee of the second mortgage was the same. From its inception the corporation was under the control of representatives of the first mortgage bondholders and representatives of certain banking institutions which had advanced money from time to time either to the corporation or to the two preceding corporations. There never was an independent board of directors representing outside stockholders and general creditors. The controlling interests were Harvey Fisk & Sons, representing first mortgage bondholders, representatives of the Chase National Bank, Standard Trust Company and the Columbia Knickerbocker Trust Company, and a representative of the Pike estate, which came into the situation through its original ownership of the land. Wilbur C. Fisk, of Harvey Fisk & Sons, representing

first mortgage bondholders, who was the president until March 14th, 1913, was the directing genius of the company. Harvey Fisk & Sons held at the time of the foreclosure $747,000 of first mortgage bonds; Robert F. Tilney, a partner, held, individually, $92,000; A. N. Tilney, a relative of Tilney, held $82,000; Tilney & Wadsworth, executors, held $81,000; out of a total issue of $1,850,000. In February, 1912, the company being in financial difficulties, Harvey Fisk & Sons demanded that the Standard Trust Company, trustee, foreclose the first mortgage. On February 14th, 1912, at a meeting of the board of directors, Pliny Fisk, a partner of Harvey Fisk & Sons, addressed the meeting and stated that since sending the request to the Standard Trust Company to bring suit for the foreclosure of the first mortgage, and to apply for the appointment of a receiver, an opportunity had arisen by which the company might be able to realize on certain of its assets and said, "that in view of the foregoing facts it was, in his opinion, inadvisable for the Standard Trust Company to proceed immediately as requested by bondholders." Then follows this resolution:

"Upon motion duly seconded, it was resolved that the Standard Trust Company be and it hereby is requested to take no action upon the request of first mortgage bondholders until further requested by them,"

no further action was taken. The plan of rehabilitation failed, and under date of February 15th, 1913, a printed document was promulgated entitled, "First Mortgage Bondholders' Protective Agreement." It nominated as a committee William C. Lane (president of Standard Trust Company), A. A. Tilney and Thomas Thacher. Lane and Tilney were, and continued to be, directors of the company. Thacher was a member of the firm of Simpson, Thacher & Bartlett, who were, and continued to be, attorneys for the company. This agreement, after inviting bondholders to participate, provides that the committee should formulate a plan for readjustment of the affairs of the corporation, or its reorganization, and that in the interval, until the adoption of a plan, the committee should have power to act for the bondholders in all matters deemed by the committee to require action. On March 14th, 1913, Wilbur C. Fisk resigned as

president, although not as director, and John A. Seely, who theretofore had been general manager, was thereupon elected as director and as president, and has ever since continued. I find that the resignation of Fisk was prompted by the impending foreclosure, plans for which at that time had been formulated and that Seely was a mere figurehead, Fisk remaining as the real executive. On April 11th, 1913, the trustee of the first mortgage, the Guaranty Trust Company, was notified of a breach of its conditions and directed to foreclose. This notice was signed by Harvey Fisk & Sons, Tilney & Wadsworth, executors, Robert F. Tilney, A. N. Tilney, A. W. Hutchins, the latter representing the Columbia-Knickerbocker Trust Company. There was a meeting of the board of directors on April 14th, 1913, at which there was a discussion with respect to the refinancing of the company. The meeting was adjourned until April 16th, when at a meeting attended by Seely, Wilbur C. Fisk, Lane, Tilney and Wiggin, it was stated that the directors had been unable to make the necessary financial arrangements. These directors were representatives of first mortgage bondholders, and Lane and Tilney were members of the first mortgage bondholders' protective committee. After knowledge, as I find, that there would be a foreclosure and reorganization, Fisk and Seely entered into negotiations with Stokes, which finally culminated in the contract of April 16th, under the terms of which Stokes was to fill in a part of the lands of Newark Meadows Improvement Company designated as tract No. 8. The agreement provided that Newark Meadows Improvement Company should not pay for the material deposited upon the land unless that portion of the land upon which the fill was deposited was sold, and that in the event of the sale with fill on same, then complainant was to be paid ten cents per cubic yard. This contract was consummated upon the very day that the meeting of the board of directors was held, at which it was stated that plans for rehabilitation had failed, and that the foreclosure must proceed, and at a time when it was known, and had been known for at least a month previous, that in all human probability there would be a foreclosure of the first mortgage and a purchase of the property on behalf of first mortgage bondholders. Two members of the first mortgage bond-

holders' committee sat in the meeting and had notice of the contract. Preliminary work had been started on the contract prior to April 16th, 1913; the actual work of dredging and filling commenced immediately thereafter and was carried on continuously until October, 1913. On May 16th, 1913, the bill to foreclose the first mortgage was filed in this court by the Guaranty Trust Company. On May 20th, 1913, William B. Kaufman, connected with the firm of Harvey Fisk & Sons, was, by consent of the company, appointed receiver. The work of filling was supervised by Allen, the engineer of the company. He continued as engineer after the receiver was appointed and made his reports direct to Kaufman, and Kaufman paid Allen for his services. Seely, Lane and Wilbur C. Fisk, on one or two occasions, examined the fill; on one occasion they thought it was too high, and Seely thinks he wrote a letter to Stokes calling attention to the fact. On June 9th, 1913, there was promulgated by the bondholders' protective committee a document entitled, "First Mortgage Bondholders' Plan and Agreement of Reorganization." It purports to be an agreement between Lane, Thacher and Tilney, designated as the committee of the holders of the first mortgage bonds, and those who should become parties to the agreement by depositing their bonds. The agreement contained a provision empowering the committee to designate additional members, and under this Keep, a director of the company, was named as an additional member. The agreement provided substantially that a new corporation should be organized to acquire the mortgaged property through the foreclosure; that the committee, or its representatives, should purchase the property at foreclosure sale and cause the same to be transferred to the new company; that the new company should have an authorized capital stock of $1,838,000, and have an issue of first mortgage income bonds of the aggregate principal amount of $500,000; that the new company should pay for the mortgaged property by delivery to the committee of so many of the mortgage bonds as "the committee may need (estimated as not to exceed $300,000) in order to pay, so far as the committee shall decide to pay the same, all said floating debt and any taxes on the property, and also the expenses of reorganization," and by the delivery to the commit-

tee of all the capital stock, or so much thereof as the committee should determine. The committee was to distribute to the depositing bondholders stock of the new company, par for par. By the agreement the depositing bondholders expressly assented to the plan and authorized the committee "to do all things in its judgment necessary or proper in their behalf as such holders to carry out said plan," "to make any agreements in its judgment necessary or proper to carry out said plan, especially agreements for the payment of any of the floating debt." All bondholders deposited their bonds, except one of the Tilney family holding seven bonds, which for a time could not be located. During the foreclosure proceedings the Columbia-Knickerbocker Trust Company was substituted as trustee for the second mortgage bondholders, and thereafter, on December 11th, 1913, and before the final decree, Raymond Dawson was substituted as trustee in place of the Columbia-Knickerbocker Trust Company. The substitutions were made at the direction of Harvey Fisk & Sons, Columbia-Knickerbocker Trust Company, Guaranty Trust Company, S. F. Telleen, the latter representing Chase National Bank, holders in the aggregate of $1,107,000 of the second mortgage bonds. On August 27th, 1914, the foreclosure proceedings reached a sale, the property was bought in for the benefit of the reorganization committee by one Durning. On December 23d, 1914, there was a change in the plan of reorganization. By this change the first mortgage bondholders were given debentures in exchange for their holdings of bonds, par for par, and stock for the amount of the accrued interest. This stock amounted to $511,873. The second mortgage bondholders were, for the first time, let in. They were given stock to the extent of twenty-five per cent. of the par of their holdings. This stock amounted to about $487,000. The property at this time had been foreclosed, the rights of the second mortgage bondholders had been cut off, and the explanation is that the second mortgage bondholders were let in as a mere gratuity. Newark Factory Sites, Inc., was incorporated in February, 1915, and all of its securities were issued as contemplated by the plan to Durning and by him distributed so that the outstanding securities of the new company were first mortgage bonds issued to pay float-

.ing debt and expenses to the amount of $300,000 (leaving un-issued some $200,000) debentures held by old first mortgage bondholders to the extent of the par of their bonds, stock held by the first mortgage bondholders to the amount of their accrued interest and stock held by the second mortgage bondholders of the old concern to the extent of twenty-five per cent. of the par of their second mortgage bonds. No other stock or other security has ever been issued by Newark Factory Sites, Inc. In the spring of 1915 the committee took steps to ascertain the amount of the floating debt of the old concern; it authorized the sending out of the circular (*Exhibit C 13*) to the creditors of the company; that circular invited the creditors to send in their claims and expressly states that the claims are to be sent in for the approval of the committee; the resolution under which it was sent out directed that it should be sent to all of the creditors. There was, undoubtedly, at the time an intent on the part of the committee to pay all of the creditors, including Stokes, but in some way or another he was overlooked. All the other creditors were paid. No notice was sent to Stokes. The floating debt was less than $300,000, so that less than $300,-000 of first mortgage bonds were used and $200,000 of them remained in the treasury. Early in 1917 Newark Factory Sites, Inc., sold the land improved by Stokes, together with some other land to the American Bridge Company for $330,000. Stokes then learned, for the first time, of the foreclosure proceedings. On August 21st, 1917, the first mortgage was canceled of record. The land upon which the filling was put was enhanced in value by the work of Stokes in an amount at least equal to the amount of his judgment. All the security holders of Newark Factory Sites, Inc., who can be affected by the decree, are parties.

From this perhaps rather too extended review of the facts, I think it clearly appears that Newark Meadows Improvement Company was always in the absolute control of its first mortgage bondholders; its board of directors acted for the bondholders; at the time the contract with Stokes was made a definite plan had been worked out contemplating a foreclosure of the first mortgage bondholders by a new corporation (which plan was subsequently carried out), the directors of the com-

pany in entering into or permitting the consummation of the contract with Stokes acted not only for the company but as a committee of bondholders under the agreement promulgated in February, 1913; under this agreement they had authority to bind the bondholders and notice to them was notice to the bondholders; the receiver was appointed at the instance of the bondholders and was a representative of the bondholders; the actual work of filling was done during the *régime* of the receiver; it was supervised by the receiver; payments were made by the receiver to the engineer for supervision of the work; the property was purchased and the rights of the second mortgage bondholders foreclosed prior to the creation of any rights in the new corporation for them; permitting second mortgage bondholders to participate in the securities of Newark Factory Sites, Inc., was a gratuity on the part of the first mortgage bondholders (no effort is made by representatives of the second mortgage bondholders to show otherwise); second mortgage bondholders took their securities charged with the knowledge that first mortgage bonds to the extent of $500,000 might be used to pay floating debts of the old concern; the property of the bondholders had been enhanced in value by work performed by Stokes without knowledge that at the very time his contract was made, and during all of the time that the work was being performed, proceedings were in progress instituted by the first mortgage bondholders, actual owners of the property, which would result, if the position taken by the defendants is tenable, in his not being paid.

If it were the intent of the directors that Stokes should not be paid by the new company, then, undoubtely, there was a fraud committed on Stokes. The contract provides that he should not be paid until the property be sold. At the time the contract was made, the directors and representatives of the bondholders knew that in a few months the rights of the corporation would be foreclosed. They knew that there would be no sale, in the ordinary sense, of the property by Newark Meadows Improvement Company; the sale contemplated was a sale of all of the property under foreclosure. Attributing honest motives to the directors they must have intended the term "sale of property" to

refer to the sale of the property by the new corporation. The subsequent actions of the committee indicate that it was their intent to pay all of the floating debt. I am quite clear, in my mind, that these directors did not intend to defraud Stokes; that they intended to pay him as they paid the others, and that he was overlooked until such a time as that when the matter did come up they considered, as their counsel suggests, that they had no right to pay him. I think that the first mortgage bondholders at the time the contract was made and during the time it was performed to all intents and purposes, were in the position of mortgagees in possession through their control of the board of directors prior to the receivership, and through the receiver thereafter; that when Durning bought at the foreclosure sale he took the property burdened with the contract of Stokes; that when the second mortgagees were given consideration their rights were subsequent to the rights of Stokes under his contract; that when Newark Factory Sites, Inc., acquired title, it did so charged with the obligations of the contract with Stokes; that the right of Stokes to recover arose at least on the sale of the property to the American Bridge Company, Newark Factory Sites, Inc., assumed, in writing, all of the liabilities of the committee of bondholders. I conclude that the bondholders are estopped from denying responsibility on a contract, the result of the performance of which, during a time when their representatives knew that proceedings in their behalf were being taken to foreclose the interest of the mortgagor and to effect a vesting of title in their creature, has been to enhance the value of their property. If the bondholders and their committee are estopped so is Newark Factory Sites, Inc., it having assumed the liabilities of the committee.

The case differs materially from *Toledo, D. & B. R. Co.* v. *Hamilton, 134 U. S. 296; 33 L. Ed. 905.* In that case the supreme court of the United States held that a contractor with a railroad company for the improvement of its property was not entitled to priority over a mortgage recorded three years prior to the work being done. It was claimed that part of the work was performed after the bringing of the foreclosure suit and the appointment of a receiver. The court held that the evidence

did not support the claim. It did not intimate an opinion as to whether, if the claim had been supported, there might have been a recovery. The material features of the case _sub judice_ were absent. In this case the work was performed under a contract entered into on the eve of the receivership with the acquiescence of a board of directors, in reality a committee of bondholders, and most of the work, if not all, was performed during the receivership, during a time that the property was wholly within the control of bondholders. The bondholders, through their representatives, not only actually sat by and let Stokes enhance the value of their property, without notice of the pending foreclosure proceedings which would deprive him of compensation, but, actually, through their receiver, participated in the improvement work. The excerpt quoted from _Wendell_ v. _Van Rensselaer, 1 Johns. Ch. 344,_ by Vice-Chancellor Pitney, in _Summer_ v. _Seaton, 47 N. J. Eq. 103,_ expresses the law: "There is no principle better established in this court, nor one founded on more solid foundations of equity and public utility, than that which declares, if one man, knowingly, though he does it passively, by looking on, suffers another to purchase or expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by his equitable estoppel." While it is true that Stokes had knowledge, constructive, at least, of the existence of the first and second mortgages, he had no knowledge of the foreclosure proceedings and no knowledge of the plan which, if carried through, would deprive him of any compensation. He might be perfectly willing to gamble on the chance of the mortgages being foreclosed and a reorganization effected at some future time, but if the position taken by the defendants be correct, there was no gamble. It was a moral certainty at the time Stokes entered into his contract that he never would be paid. The powers given by the bondholders to the committee, which was in existence at the time the contract was made, and the powers subsequently conferred during the time of the performance of the contract and the act of the new corporation in taking the property

charged with the liabilities of the committee were sufficient to bind both the bondholders and the corporation for the acts of the committee and to bind them by notice to the committee. I have already dealt with the situation of the second mortgage bondholders, the only other security holders of the corporation.

I think in a situation where a corporation is in control of a board of directors, in reality representing first mortgage bondholders, and there is a committee of first mortgage bondholders, the majority of whom are members of the board of directors of the corporation, which committee has power from the bondholders to perform all acts which may be necessary in their judgment to effectuate a plan of reorganization, and a plan has been formulated which provides for the foreclosure of the first mortgage, the purchase of the property by a representative of the first mortgage bondholders, the transfer of the property to a corporation to be incorporated, and the issuance of securities by the new corporation to holders of securities in the old corporation, and on the eve of proceedings to foreclose being instituted and the plan carried out, a contract is made to the knowledge of the representatives of the first mortgage bondholders, providing for work on the land which enhances its value and the work proceeds without notice to the contractor of the plans or of the proceedings thereunder, during most of which time the property is in the control of a receiver appointed at the instance of the first mortgage bondholders, with the acquiescence of the corporation, and the receiver supervises such work and actively participates therein, and the property is subsequently bought in by the nominee of the bondholders, and, subsequently, transferred to a corporation incorporated by the bondholders, and the securities of that corporation issued to security holders of the old corporation in accordance with the plan, that the land in the hands of the new corporation is charged with a lien for the amount that it has been enhanced by the work of the contractor, and that second mortgage bondholders who have been gratuitously let in after the foreclosure by the first mortgage bondholders are not entitled to any rights as against the contractor.

In this case the land upon which the improvement has been made has been sold to a *bona fide* purchaser for value without

notice so that the land cannot be followed. A money decree, however, may go against the new corporation. The method provided for the payment of the floating debt was the issuance of first mortgage bonds in an amount not exceeding $500,000. The plan contemplated that all of the creditors should be treated alike, and I think that Stokes is entitled to equal treatment with the other creditors. He is entitled to preference over the rights of the first and second mortgage bondholders of the old company. Inasmuch as he cannot have a lien upon the land improved, I think he is entitled, if he desires it, to a reinstatement of the first mortgage of Newark Factory Sites, Inc., to the extent necessary to secure bonds to be issued to him for the par of his claim. The reinstated mortgage, however, to exclude from its operation lands sold by Newark Factory Sites, Inc., to *bona fide* purchasers without notice.

I will advise either a money decree against the defendant Newark Factory Sites, Inc., or a decree reinstating the first mortgage as hereinbefore stated and directing the corporation to issue bonds to Stokes for the par of his claim, or such other decree as counsel may suggest as will have the effect of preferring Stokes to the interests of the first and second mortgage bondholders of the old concern.

Settle decree on two days' notice.